GREENING v. COMMERCIAL TRIBUNE CO.

(Circuit Court of Appeals, Sixth Circuit. January 21, 1904.)

No. 1,207.

1. CONTRACT OF EMPLOYMENT—CONSTRUCTION.

Defendant employed plaintiff to take charge of its advertising department from April 2, 1900, to January 1, 1902. The contract provided that defendant should be paid for his services, for the year 1900, "a sum equal to 50 per cent. of the excess of the net cash paid" to defendant for advertising during the months of April to December, 1900, both included, over and above the net amount paid to it for the corresponding months of the year 1899, which was $103,000; that defendant should receive, for the year 1901, 40 per cent. of the net cash paid to defendant for advertising during that year in excess of $136,000; that the compensation paid plaintiff in any year should not exceed $10,000 "until the net cash receipts of the company for advertising in said year" should be at the rate of $160,000 a year; and that if the net cash receipts for advertising during the nine months of 1900, and during the year 1901, should be $20,000 or more in excess of $239,000, then plaintiff should have the option of extending the contract for four years, or until and including 1905. Defendant's contracts for advertising were mostly cash, and receipts were credited to the month in which the advertising was done, though not collected until the succeeding month. *Held*, that whether plaintiff was entitled to an extension of the contract depended on whether or not the amount of the net cash defendant received for advertising done during his term of service exceeded the amount specified, and did not depend on the amount of net cash received during plaintiff's term of service for advertising done, without regard to time.

In Error to the Circuit Court of the United States for the Southern District of Ohio.

Judson Harmon and L. C. Black, for plaintiff in error.

Pogue & Pogue (Province M. Pogue, of counsel), for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This was an action brought by the plaintiff in error, Henry B. Greening, against the defendant in error, the Commercial Tribune Company, on a contract for the employment of the former as advertising manager of the latter. The plaintiff claimed a balance due for services under the contract, and damages for the wrongful refusal to extend it. Under the court's construction of the contract, which the plaintiff submits was erroneous, the jury was instructed to return a verdict for but a portion of the amount claimed due for services, and nothing for the alleged breach of contract. The instructions given are here for review.

The testimony tended to establish the following facts: In the early part of 1900, the advertising business of the Commercial Tribune, a newspaper conducted in Cincinnati, was not in a satisfactory condition. It had been "going downhill." The plaintiff was an experienced advertising manager, then located in New York. He was consulted, and came to Cincinnati in March, 1900. He examined the books, looked over the ground, and a contract was made, under which, on April 2, 1900, he took charge of the advertising business for the

remaining nine months of 1900, and for the year 1901, with the option of extending the contract for four years more upon certain conditions. The following is the contract:

"The Commercial Tribune Company, a corporation, and Henry B. Greening, hereby agree with each other as follows:

"The said company hereby employs the said Greening as advertising manager of the daily and Sunday Commercial Tribune during the period from April 2, 1900, to January 1, 1902, both inclusive, upon the following terms and conditions:

"I.

"(1) He agrees to devote all his time, skill and ability to the duties of said employment, and to increasing the net amount of cash received by said company for advertising.

"(2) He is to have absolute control of the advertising department, both foreign and local, of said daily paper, during said period, subject, however, to the dictation and control of the manager of said company, and is to receive orders from him and no one else. He is to have not less than two assistants who shall work under his direction, take their instructions from him only, and be selected by himself with the approval of said manager. He is to have the co-operation of the editorial department to such extent as may be deemed necessary by him and said manager.

"(3) All advertising contracts shall pass through his hands. No other employé of said company shall make terms, rates, etc., lower than those printed on its regular rate card, nor shall the said Greening do so without the written consent of said manager.

"(4) He shall have access to the advertising records of said company for the purpose of determining the net amount of advertising receipts during any portion or all of said period.

"II.

"The company agrees (subject to the proviso hereinafter contained):

"1st. To pay him on or before January 15, 1901, for his services during the year 1900, a sum which shall be equal to 50 per cent (fifty per cent) of the excess of the net cash paid to it for advertising in the daily and Sunday Commercial Tribune during the months of April to December, 1900, both included, over and above the net amount paid to it for the corresponding months in the year 1899, which was $103,000.

"2d. To pay him on or before January 15, 1902, for his services during the year 1901, a sum which shall be equal to forty per cent (40 per cent) of the net cash paid to it for advertising in said daily and Sunday, during the year 1901, in excess of one hundred and thirty-six thousand dollars ($136,000).

"3rd. To advance to him during said period on account of said compensation fifty dollars ($50) at the end of each week, the amount of such advances for each year to be deducted from the amount which may be found due him at the final settlement at the end of each year.

"4th. Provided, however, that the compensation paid him shall in no year exceed the sum of ten thousand dollars ($10,000) per annum, until the net cash receipts of said company for advertising in said year shall be at the rate of one hundred and sixty thousand dollars ($160,000) per annum. After its said net receipts shall have attained said sum of $160,000 in any year, any surplus for that year shall be paid to the said Greening until he shall have received the rate of compensation herein fixed for that year.

"III.

"If the total net cash receipts for advertising in said daily and Sunday Commercial Tribune during the said nine months of 1900, and during the year 1901, is twenty thousand dollars ($20,000), or more in excess of two hundred and thirty-nine thousand dollars ($239,000), then at the option of said Greening this contract shall be extended for four years, that is for the years 1902, 1903, 1904 and 1905, upon the same terms and conditions except that the compensation to be paid him during each of these four years shall be thirty-three and one-third per cent (33⅓ per cent), only of the net cash re-

ceipts for advertising during that year in said daily and Sunday Commercial Tribune over and in excess of one hundred and thirty-six thousand dollars ($136,000)."

At the examination made by the plaintiff before he entered into the contract, he found the advertising business, as conducted, was substantially a cash one. An insignificant amount of transient advertising was paid for when ordered, and was known as "counter cash." All other advertising was charged on the advertising ledger, and was payable monthly. The charges were made the month the advertising was done. The bills were made out between the 1st and 5th of the succeeding month, and at once put in process of collection. When paid, the cash receipts were credited to the month the advertising was done. To ascertain what had been done the year before, as a basis for his compensation, in case he should materially increase the business and receipts, the plaintiff examined the advertising ledger. He testified he understood that the figures inserted in the contract sent him to New York for signature were taken from the ledger and agreed with the results of his examination. After assuming charge, in order to be kept informed of the result of his work, he was furnished at the end of each month, that is, between the 1st and 5th of the succeeding month, a written statement, taken from the advertising ledger, of the business of the month. The monthly advertising bills were in some instances subject to certain commissions, discounts, and other deductions, which accounted for the use of the words "net cash," "net receipts," and "net cash receipts" used in the contract; but, so far as the plaintiff was concerned, they were treated as collectible, and, in point of fact, of the $280,000 of earnings from April 2, 1900, to January 1, 1902, all but about $800 had been paid when this case was tried. It was no part of the plaintiff's duty to collect the accounts, although he did work in that line on special occasions when asked.

On taking charge, the plaintiff found the advertising department in bad shape. He reorganized it, and set to work to build up the business. During the remaining nine months of 1900 there was no increase of business entitling him to a percentage on the excess, so he received only the sum of $50 a week advanced him under the contract. The next year, 1901, his work began to tell, and, as the monthly statements showed, there was a large and growing increase in the business and receipts. The general manager expressed great satisfaction with the way the plaintiff was getting on. Twice during the year—the last time in October—it was necessary for the plaintiff, in order to secure certain men, to increase the salaries paid before he became advertising manager, and each time the general manager said, "Here, you are making $15,000 to $16,000 a year, and you have got to stand some of this excess." So the plaintiff did.

In October, November, and December, without the consent of the plaintiff, the company took three notes, amounting in the aggregate to about $7,000, extending the time for the payment of certain accounts beyond the end of the year. The notes were perfectly good, could have been discounted at any time, and were paid when due. The advertising business during the closing months of the year was unusually good. In October it amounted to about $18,000, in November to

nearly $21,000, and in December to about $20,000. At the same time the business increased, the collections began to fall off, and, on December 31, 1901, there was outstanding and unpaid over $37,000. Such being the condition of affairs and the time approaching for ascertaining whether the plaintiff was entitled to extend the contract by reason of having increased "the total net cash receipts for advertising during the nine months of 1900, and during the year 1901, in the sum of $20,000 or more in excess of $239,000," the general manager, now president, of the company, wrote the plaintiff, stating it would be impossible at that time to ascertain whether he was entitled to extend the contract, and requesting him to enter into an agreement to continue with the paper until such time, not exceeding four months, as might enable them to adjust and determine the questions and matters in doubt. The plaintiff declined to enter into this agreement, telling the president, both orally and in a letter, that the figures were at hand to determine whether he was entitled to extend the contract, and calling his attention to the fact that the advertising business had been exceptionally good, and that the only trouble was in the collections, which were being needlessly delayed. The answer to this was a letter peremptorily notifying him that he was not entitled to extend the contract, that it was at an end, and he might act accordingly. The usual statement of the advertising done during the month of December was refused the plaintiff, and the collector was notified by the officers of the company not to collect the December bills. It appears, however, as we have already stated, that, of the $37,000 outstanding at the close of 1901, all but about $800 had been collected when the suit was tried below.

On the trial, in view of the above testimony, it became a question whether the measure of plaintiff's compensation, and the test of his right to extend the contract, was the amount of the net cash the company received for advertising done during his term of service, or the amount of net cash it received during his term of service for advertising done, no matter when. The court took the view that the latter construction was the correct one, and so instructed the jury. Was the court correct in so holding?

1. The object of the contract was to increase the advertising business of the paper. The inducement to the plaintiff to leave New York and come to Cincinnati was the large percentage offered him on the fruits of the increase. The new business must be good business, business which would result in an increase of the net cash receipts, and of this increase he was to get his share. As he had nothing to do with the collection of the accounts, the only way in which he could increase the net cash receipts was by adding to the advertising business. Accordingly, the contract carefully provided that he should get his share of the net cash of the increase—the excess of net cash received for advertising done when he had charge over that received before. Thus, the contract provided that he should be paid for his services during the year 1900 "a sum which shall be equal to 50 per cent. of the excess of the net cash paid to it for advertising in the daily and Sunday Commercial Tribune during the months of April to December, 1900, both included, over and above the net

amount paid to it for the corresponding months in the year 1899, which was $103,000." Observe the precision of the language. This provision does not read:

"A sum which shall be equal to 50 per cent. of the excess of the net cash paid to it during the months of April to December, 1900, both included, for advertising in the daily and Sunday Commercial Tribune, over and above the net amount paid to it during the corresponding months of the year 1899, which was $103,000."

But the defendant contends it means this, and the court so held. If it does, why did not the parties employ the latter language? If the compensation was to be computed upon the excess of net cash paid the company during the period mentioned for advertising, no matter when, why not say so? So with respect to the second clause, which provides that for the year 1901 the plaintiff shall receive a sum "which shall be equal to 40 per cent of the net cash paid to it [the company] for advertising, * * * during the year 1901, in excess of $136,000." It was not "the net cash paid the company during the year 1901 for advertising, no matter when," but that paid it "for advertising during the year 1901," which was to govern. So, in the fourth clause, where it is provided that the compensation paid him shall in no year exceed the sum of $10,000 "until the net cash receipts of said company for advertising in said year" shall be at the rate of $160,000 per annum. The net cash receipts are those received, no matter when, "for advertising in said year," and not those received in said year for advertising, no matter when. And with respect to the extension, the same exact use of words is apparent. If the total net cash receipts "for advertising * * * during the said nine months of 1900, and during the year 1901, is $20,000 or more in excess of $239,000," then the plaintiff should have the option of extending the contract for four years.

2. So much for the natural construction of the language. But the court below thought that, unless the compensation was based on the actual cash received during the year, there would be no method of reaching a final settlement at the end of the year. Apropos of this, the record shows that it took the bookkeeper some eight months to figure out the net cash receipts for the nine months of the year 1900, and the president of the company requested the plaintiff to give him four months' time to figure out the net cash receipts during the year 1900. So it does not appear from the facts shown that the construction the court took would expedite in any way the yearly or final settlement. As a practical matter, it was as easy to reach a settlement under one construction as the other.

We have already referred incidentally to the construction the parties put upon this contract. The contract provided that the plaintiff should have "access to the advertising records of said company for the purpose of determining the net amount of advertising receipts during any portion or all of said period." The advertising records show the advertising receipts, but show them credited to the month in which the advertising was done. The statements rendered at the close of each month, both to the president of the company and to the plaintiff, were based upon these records. Each month's business was credited to the month when it was done, and so were the receipts for it. The

general manager of the company was thus kept advised, from month to month, of the amount of business done during the month, and of the cash the company would receive for advertising during that month, This explains why the general manager demanded that the plaintiff should pay a part of the increased compensation of his assistants, because he was making "$15,000 or $16,000 a year." Such was the precise amount he would have received if accounts collected after his discharge had been considered in making the computation.

3. But it is suggested that, under the construction of the court below, things would balance themselves. If the plaintiff lost the benefit of some receipts earned before his term ended, he got the benefit of some receipts earned before his term began. If he lost the benefit of $20,000 earned in December, 1901, he got the benefit of $18,000 earned prior to April 1, 1900. But in point of fact, not simply the December accounts, but certain accounts of preceding months went over. Altogether, the notes and accounts uncollected at the close of 1901 amounted to about $37,000. A man deprived of 40 per cent. of $37,-000, receipts resulting from his own work, is hardly compensated by a like percentage on $18,000, receipts resulting from his predecessor's work. The difference is nearly $20,000; that represented $8,000 compensation, and, under the contract, was enough to entitle him to extend it for four years more. The natural construction is the just and reasonable one. He was employed to increase the business. More business meant more receipts—an excess of cash paid in—and of this the plaintiff was to get his share. The business being substantially a cash one—bills payable monthly—the presumption was that the year's accounts would be collected by the 15th of January, if proper efforts were made. At any rate, by that time it could be ascertained with sufficient certainty what the cash receipts from the advertising done during the year would be. Certainly that construction ought not to be favored, ought rather to be avoided, which put it in the power of one of the parties, after receiving the benefit of the other's work in increased earnings, to deprive him of his compensation by postponing for any cause the turning of those earnings into cash.

The judgment of the lower court is reversed, and the case remanded with instructions to grant a new trial.